# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2400-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

C. P.,[1]

     Defendant-Appellant.

_____

Submitted November 8, 2023 – Decided December 15, 2023

Before Judges Sumners and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 95-08-0915.

Joseph E. Krakora, Public Defender, attorney for appellant (Alison Gifford, Assistant Deputy Public Defender, of counsel and on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Timothy P. Kerrigan, Jr., Chief Assistant Prosecutor, of counsel and on the brief).

---

[1] We employ initials to refer to defendant C.P. as required by N.J.S.A. 30:4-123.51e(e)(4).  See also State v. F.E.D., 251 N.J. 505, 524 (2022).

PER CURIAM

On November 24, 2021, C.P. petitioned the trial court for release pursuant to the Compassionate Release Act (CRA), N.J.S.A. 30:4-123.51e. C.P. currently suffers from a combination of debilitating medical conditions including, hypertension, hyperlipidemia, chronic kidney disease, diabetes mellitus, chronic renal insufficiency requiring dialysis, and gangrene in her right foot. She also had her left leg amputated below the knee and suffered a recent heart attack. Due to her full-time nursing needs, C.P. currently is living in the infirmary at Edna Mahan Correctional Facility for Women (EMCF). She has served twenty-eight years of a life sentence and is eligible for parole on March 8, 2025.

The trial court rejected C.P.'s petition after a plenary hearing, finding the presence of certain extraordinary aggravating factors warranted denial. C.P. appealed, arguing the trial court abused its discretion. We agree and find the trial court misapplied the Supreme Court's guiding principles set forth in State v. A.M., 252 N.J. 432 (2023). We therefore reverse and order C.P.'s compassionate release.

I.

A-2400-22

On May 28, 1997, C.P. pleaded guilty to several charges, including the murder of Tara Carter, the murder of her husband A.P.,[2] and the attempted murder of Eugene Cooper. Carter, eighteen at the time of her death, was living in Paterson with C.P., the mother of her close childhood friend. Carter's body was discovered in a park on March 4, 1995. Her autopsy revealed the cause of death to be blunt force trauma to the head. Once her body was identified, the police learned that Carter had been living with C.P., and through further investigation found that C.P. was listed as a beneficiary on a $25,000 life insurance policy in Carter's name.

During execution of a search warrant at C.P.'s address, an officer recalled that a stabbing victim, Cooper, had previously resided with C.P. When interviewed, Cooper confirmed he was living with C.P. and her family when he was stabbed. He identified his assailant as Charlie Pinchom, C.P.'s daughter's boyfriend, from a photograph. Cooper also said that C.P. had asked him to name her as a beneficiary to a life insurance policy, and that C.P. had solicited him to murder her husband, A.P., but he refused. The search of C.P.'s residence revealed insurance documents related to Cooper.

---

[2] A.P.'s initials are used to more effectively preserve C.P.'s confidentiality.

A-2400-22

A.P. died in September 1991 due to mixed drug intoxication involving several anti-anxiety and anti-depressant prescription medications. At the time, his death was considered accidental. Police initiated an investigation into A.P.'s death after interviewing Cooper, and their review of the toxicology report revealed prescription medications in A.P.'s system which were also prescribed to C.P. Notably, police also learned C.P. had received a life insurance payout for her husband's death.

Pinchom confessed to the attempted murder of Cooper and killing Carter and disposing of her body, at the direction of C.P. The police then charged C.P. for Carter's murder, A.P.'s murder, and the attempted murder of Cooper, in addition to lesser charges.

In 1997, a trial court sentenced C.P. to concurrent life terms with thirty years of parole ineligibility for the murders of A.P. and Carter, and to a consecutive prison term of twenty years for the attempted murder of Cooper. At sentencing, the judge found three aggravating factors: (1) the offense was committed in a heinous, cruel, or depraved manner; (2) the risk defendant will commit another crime; and (3) the need to deter defendant and others from violating the law. See N.J.S.A. 2C:44-1(a)(1), (3), (9).

Some twenty-four years later, C.P. filed her compassionate release petition, resulting in six days of hearings between September 2022 and March 2023. The State presented multiple witnesses in opposition to release. C.P. presented testimony from medical professionals and family members. The court considered numerous documents submitted into evidence by both sides, including but not limited to letters for and against release.

Dr. Sandra Braimbridge, the medical director of EMCF and an expert in internal medicine, testified that C.P. required assisted living "at a minimum," if not placement in a nursing home. Another expert, Candace Lumax from the New Jersey Department of Health, Division of Aging Services, testified that C.P. would qualify for Medicaid if released, and that C.P. meets a "nursing facility level of care." Dr. James Cassidy, the supervisor of mental health at EMCF and an expert in forensic psychology, testified concerning C.P.'s mental state, opining that C.P. is mentally stable and presents a "very low risk" for committing harm to herself or others, or for committing any crimes.

Four of C.P.'s family members testified for release: her daughter and son, as well as two adult granddaughters. C.P.'s proposed release plan, approved by the New Jersey State Parole Board, involves living with her daughter, a licensed nurse living in Texas who has experience working in the state's prison system.

C.P.'s daughter testified that she would support C.P. emotionally and physically if released.

Opposing C.P.'s petition, three witnesses related to murder victim Carter testified. Rosie Carter, Tara's older sister, spoke about their strong relationship, and their plans to move to Georgia. Tara White, a childhood friend of Carter also testified in opposition to C.P.'s release, stating she was upset by the petition. The last witness to testify in opposition was Benicia Curry, Carter's daughter. Curry testified that she was two years old when her mother died, and she has no memory of her. She also testified about the emotional challenge of growing up without her mother.

The trial court issued an order denying C.P.'s petition, along with a comprehensive statement of reasons. The court found by clear and convincing evidence that C.P established both the medical and public safety factors under N.J.S.A. 30:4-123.51e. The court stated:

> There is no doubt that C.P. . . . suffers from permanent physical incapacity, as related by the medical witnesses herein. She is dependent on others, on a 24/7 basis, for transfer, locomotion, bathing, dressing, and needs assistance to get to the bathroom.
> With respect to whether she is a danger to society if released, this court finds that. . . she is not. . . .The

6

AM/Oliver[3] decisions discuss whether the defendant is a "realistic danger" to the public. Realistically, I find that she is not.

The court took note of C.P.'s good behavior and work ethic while in prison and found the parole plan satisfactory. Next, the court turned to "whether there are extraordinary aggravating factors, relating to the original offenses." The court found that

> [F]urther harm to the victims would be intense and that the aggravating factors surrounding these offenses, two deceased victims and a third seriously injured victim, the vulnerability of each victim, and the heinous cruelty involved, particularly as to Tara Carter who was beaten to death with a crowbar, and to Eugene Cooper who was stabbed repeatedly, strongly mitigates against release.

The court rested its decision in part on the manner of the victim's murders, noting "these horrible crimes were committed over a substantial period of time. . . . not . . . on one date under great stress or turmoil," along with the fact that life insurance policies were taken out on each of the victims by C.P. The court found C.P.'s testimony lacked sincerity, and stated "[c]andidly, I am simply unable to draw any strong conclusion as to her alleged remorse. In this court's view, the

---

[3] State v. A.M., 252 N.J. 432 (2023) (companion case, State v. Oliver, 251 N.J. 209 (2022))

most compelling testimony was that of Bernicia Curry, Tara Carter's daughter, and of Rosie Carter, Tara's sister." The court found:

> Bernicia's life has been and continues to be profoundly and grievously affected by both the death of her mother and by the horrible manner in which she died. It has been terrible enough for her to cope while C.P. is serving her prison sentence. This court concludes that releasing C.P. on this petition would cause additional profound grief and depression and anger to her. Such reaction would, in this court's view, be reasonable and expected.

The single issue on appeal is whether the trial court engaged in a proper exercise of discretion when it applied the analytical framework established by the Supreme Court in A.M., 252 N.J. 432.

## II.

As background, we briefly examine the CRA and the Supreme Court's application of it in A.M. The Legislature enacted the CRA, which "provides for the release of inmates who suffer from a medical condition so severe that they are incapable of committing a crime and, in certain cases, would not pose a threat to public safety if released." Id. at 438. The CRA was designed to replace the prior medical parole law[4] by "outlin[ing] a streamlined process to obtain relief." Ibid. Unlike the previous law, the CRA expands eligibility to inmates convicted

---

[4] N.J.S.A. 30:4-123.51c (repealed 2020).

of certain serious crimes. The new statute shifts the forum for initial consideration of release applications from the parole board to the courts. Ibid. The CRA "reflect[s] the Legislature's intent to show compassion to people with serious medical needs, decrease the prison population, and reduce healthcare costs for correctional facilities." Ibid.

Procedurally, the inmate must procure a "Certificate of Eligibility" from the Department of Corrections (DOC), before an inmate may petition for release under the CRA. N.J.S.A. 30:4-123.51e(f)(2). The DOC must "promptly issue" the certificate if two department-assigned physicians "determine[] that an inmate is suffering from a terminal condition, disease . . . or permanent physical incapacity." N.J.S.A. 30:4-123.51e(d)(2). A "permanent physical incapacity" is defined as "a medical condition that renders the inmate permanently unable to perform activities of basic daily living, results in the inmate requiring [twenty-four] hour care[,] and did not exist at the time of sentencing." Ibid.

Once in possession of a certificate, an inmate may file a petition with the court and serve notice to the county prosecutor or attorney general, who then must provide notice to the inmate's victims or family of the victim(s) that would be entitled to notice regarding the inmate's parole. N.J.S.A. 30:4-123.51e(e)(2). The victims as well as friends and family of victims may also testify at the

A-2400-22

hearing concerning "any harm [they]suffered."  Ibid.  Compassionate release "may" be granted only where the court finds by clear and convincing evidence that the inmate is so debilitated or incapacitated by the terminal condition, disease or syndrome, or permanent physical incapacity as to be permanently physically incapable of committing a crime if released.  N.J.S.A. 30:4-123.51e(f)(1).

The A.M. Court considered the language of the statute and determined that "[c]onsistent with the text and history of the statute, trial courts have discretion to decide whether to release an inmate who meets the first two requirements."  A.M., 252 N.J. at 457.  In its reasoning, the Court noted that the statute's inclusion of the victims, and providing them with an opportunity to testify, is instructive in determining the Legislature's intent, "[o]therwise, testimony from victims would be little more than a potentially cathartic but hollow exercise. . . ."  Id. at 453.

The CRA does not spell out factors for a trial court to consider, but the A.M. Court spotted this flaw and provided further instruction.  Id. at 456.  The Court concluded that "unless one or more extraordinary aggravating factors exist," an inmate who satisfies "the Act's medical and public safety criteria should be granted compassionate release."  Id. at 460.  The Court then provided

examples of "extraordinary circumstances" a trial court may consider in determining whether extraordinary aggravating factors exist to defeat release. Ibid. The examples included:

> (1) particularly heinous, cruel, or depraved conduct; (2) a particularly vulnerable victim based on the person's advance age, youth, or disability; (3) an attack on the institutions of government or the administration of justice; and (4) whether release would have a particularly detrimental effect on the well-being and recovery process of victims and family members. For the fourth factor, courts should apply a standard of objective reasonableness.
>
> [Ibid.]

We note the bar for finding extraordinary aggravating factors "is a necessarily high one," and that "such factors cannot be used as a substitute for all serious crimes." Id. at 460-61.

C.P.'s petition is the first CRA appeal since A.M. was decided.


III.

The record shows C.P. demonstrated by clear and convincing evidence that she satisfied both the medical and public safety requirements. See N.J.S.A. 30:4-123.51e(f)(1). Mindful that murder always is a "most serious" offense, A.M. 252 N.J. at 462, we turn to the trial court's "extraordinary aggravating factor" findings.

A.

The court found the murders of A.P. and Carter, as well as the assault on Cooper, to be "extraordinarily cruel and vicious," consistent with its conclusion that C.P. engaged in particularly heinous, cruel or depraved conduct in line with extraordinary aggravating factor one under A.M., In support of its finding, the court cited the blunt force trauma sustained by Carter and the repeated stabbing of Cooper.[5] Finally, the court found C.P.'s crimes did not result from "stress or turmoil," but rather were planned crimes which were driven by financial gain, as evidenced by the life insurance policies C.P. procured for all three victims. These facts represent the totality of the trial court's support for its finding that extraordinary aggravating factor one applies to deny release.

The court next turned to A.M. extraordinary aggravating four, "whether release would have a particularly detrimental effect on the well-being and recovery process of victims and family members." The court focused on the testimony of Curry, Rosie Carter, and White in connection with Carter's death. We address the witnesses in ascending order of significance to the analysis.

---

[5] We note the court identified Cooper as an autistic victim in its statement of reasons, however we find nothing in the record to support this characterization of his medical condition.

White, a friend of Carter's, testified that the victim was "beloved," and the court acknowledged White's grief as well as that of other friends and relatives who wrote in opposition to release. Rosie Carter testified that the victim was preparing to relocate to the family home in South Carolina when she was murdered. After hearing Rosie's testimony, the court found she "had suffered grievously and would be profoundly affected and emotionally harmed by an early release of C.P." The court called Rosie's emotional state "reasonable and expected." The trial court took a longer look at the impact of Carter's death on her surviving child, Bernicia. It found her "profoundly affected" by her mother's death and concluded, without medical expert testimony, that C.P.'s release would cause Bernicia "additional profound grief, depression, and anger." The trial court acknowledged the ongoing trauma, sense of loss, and pain testified to by Carter's friend, sister, and daughter as they opposed C.P.'s release.

### B.

We consider the trial court's aggravating factor analysis in light of the Supreme Court's principles set forth in A.M. First, the facts found by the trial court undoubtedly establish a basis for a finding of aggravating factor one pursuant to N.J.S.A. 2C:44-1(a)(1). Indeed, the sentencing court made such a finding in 1995, however that is not the statutory framework we are asked to

A-2400-22

apply. Instead, we must examine the record through the lens of the CRA. The tragic facts present here—premeditation, blunt force trauma, and monetary gain—are often present in first-degree murder cases. This sad reality in no way diminishes the seriousness of C.P.'s crimes. However, the A.M. Court instructs us that in the context of compassionate release, the standard for evaluating aggravating factors is "necessarily" higher. We must ask whether extraordinary aggravating factors exist. A.M. at 460. We cannot conclude that these facts, common to the crime of murder, rise to the level of extraordinary. In our view, characterizing the trial court's findings on this factor as extraordinary would create "de facto categorical barriers to release," against the guidance of A.M. 252 N.J. at 459-60.

We next turn to consideration of aggravating factor four. The trial court's findings were primarily grounded in the survivors' testimony. It found that C.P.'s release, almost twenty-eight years after her conviction, would cause "intense" further harm "to the victims." Although the trial court did not expressly state it in these terms, its findings can be reframed in the language of A.M. this way: it is objectively reasonable to conclude C.P.'s release would have a detrimental effect on the recovery process of the victims' relatives. We do not agree. Nearly three decades after C.P's conviction and sentencing, we

cannot conclude that her compassionate release under the statute would have a "particularly detrimental effect" on well-being and recovery.

When we consider the harm testified to by Curry and Rosie Carter, we recognize that such harm is an unfortunate byproduct of the expected trauma that survivors of murder victims will experience. Applying a standard of objective reasonableness, we cannot conclude the survivors' testimony, which evoked great pathos during the hearing, rose to the level of an extraordinary aggravating factor. Id. at 460.

C.

Recognizing the inherent seriousness of C.P.'s crimes, our application of the principles established by the Court in A.M. leads us to conclude "there are no extraordinary aggravating factors that would bar [C.P.'s] release." We are therefore constrained to conclude that the trial court engaged in an inappropriate exercise of judicial discretion when it denied C.P.'s compassionate release. Id. at 461.

In closing, we note the Court's final words in A.M.[6] are apt:

---

[6] We comment briefly on Oliver, the companion case to A.M. In Oliver, the defendant shot and killed a detective in the Essex County courthouse. 252 N.J. at 446. The Supreme Court denied compassionate release to the defendant solely on the ground of extraordinary aggravating factor three, an attack on the

A.M.'s crime was without question a most serious offense. She deliberately murdered her husband, and her children offered heartfelt testimony in opposition to her release. But the law no longer bars inmates convicted of murder from seeking compassionate release. Although A.M.'s crime is an inherently serious one, there are no extraordinary aggravating factors that would bar her release.

[Id. at 462.]

We reach the same result. C.P. met the requirements under the CRA, and her petition should have been granted.

Reversed and remanded to the trial court for entry of a prompt order granting C.P.'s release. In accordance with N.J.S.A. 30:4-123.51e(g), our reversal of the court's order denying C.P.'s petition for compassionate release shall not become final for ten days to allow the State to petition the Supreme Court for certification or other relief. We note this matter should be addressed on an accelerated basis.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

institution of justice. A.M. at 463. The Court considered no other extraordinary aggravating factor in denying release. Ibid.

16

A-2400-22